UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF JERMAINE CLAYBROOKS,
by Co-Special Administrators,
JOAN McCANTS and KEYANNA ALLEN,
BIOLOGICAL MINOR CHILDREN                    Case No. 2:19-cv-
J.J.C., by and through KEYANNA ALLEN,
as parent and guardian, and J.D.C., by and
through MARKIA S. LOVE, as parent and
guardian,

                Plaintiffs,

v.

CITY OF MILWAUKEE,
POLICE CHIEF EDWARD FLYNN,
MILWAUKEE POLICE OFFICERS JOHN SCHOTT,
MARTEZ BALL, and JOHN IVY, WEST ALLIS
POLICE OFFICERS TODD KURTZ, and
P.O. DANIEL DITTORRICE, and SPECIAL AGENT
JAMES KRUEGER, Drug Enforcement Agency,

                Defendants.

_____/

# FEDERAL COMPLAINT WITH JURY DEMAND

NOW COME the above-named Plaintiffs, by their attorneys, Walter W. Stern III,

attorney for Co-Special Administrator Joan McCants and Markia S. Love, parent of J.D.C, and

Verona Swanigan, attorney for Co-Special Administrator Keyanna Allen, as co-special

administrator and parent of J.J.C., as and for their causes of action against the above-named

Defendants, the Plaintiffs allege and show claims for relief as follows:

## INTRODUCTION

1.    This is a federal civil rights action under the Fourth and Fourteenth Amendments to the

      Constitution of the United States and Title 42 of the United States Code, Section 1983.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 1 of 30   Document 1

Plaintiffs bring this action to obtain compensatory damages, punitive damages, attorneys' fees, costs and equitable relief for the serious personal injuries and resulting death of JERMAINE CLAYBROOKS, who was unlawfully subjected to excessive force when he was shot over fourteen times on March 16, 2017 by the Defendants, JOHN SCHOTT, MARTEZ BALL, JOHN IVY, TODD KURTZ, DANIEL DITTORRICE and JAMES KRUEGER. The conduct of the Defendants and the constitutional violations suffered by JERMAINE CLAYBROOKS occurred as a direct result of the unconstitutional policies of the City of Milwaukee, Milwaukee Police Department and their agents.

## JURISDICTION AND VENUE

Jurisdiction

2. This action arises under the 4th and 14th Amendments to the United States Constitution and Title 42 of the United States Code, Section 1983. Jurisdiction of the Court is conferred by Title 28 of the United States Code, Sections 1331 and 1343(a)(3) and (4).

Venue

3. The Eastern District of Wisconsin is the proper federal venue for this action, pursuant to Title 28 of the United States Code, Section 1391 (b), because it is the judicial district where the constitutional rights violations of JERMAINE CLAYBROOKS were committed.

## PARTIES

Plaintiffs

4. That Plaintiff, J.J.C., is a minor and the biological child of JERMAINE CLAYBROOKS, deceased. This action is brought by and through his mother and guardian, Keyanna Allen, on his behalf, and J.J.C. has been residing in the City of Milwaukee, State of Wisconsin, since birth.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 2 of 30   Document 1

5.     That Plaintiff, J.D.C., is a minor and the biological child of JERMAINE CLAYBROOKS, deceased.  This action is brought by and through his mother and guardian, Markia S. Love, on his behalf, and J.J.C. has been residing in the City of Milwaukee, State of Wisconsin, since birth.

6.     That Plaintiff, ESTATE OF JERMAINE CLAYBROOKS, proceeds in this action through its Court-appointed Co-Special Administrators, JOAN MCCANTS and KEYANNA ALLEN, asserting all claims for pain and suffering, loss of pecuniary estate, and funeral and burial expenses, and any other matter that can legitimately be claimed for the death of JERMAINE CLAYBROOKS, who was killed on March 16, 2017, at 31 years of age, and said JERMAINE CLAYBROOKS was a permanent resident of the City of Milwaukee and State of Wisconsin.

Defendants

7.     That Defendant, the City of Milwaukee ("MILWAUKEE"), at all times material hereto, was a municipal corporation, organized and existing under the laws of the State of Wisconsin, whose principal offices are located at City Hall, 200 East Wells Street, Room 205, City of Milwaukee, State of Wisconsin, 53202.

8.     That Defendant, EDWARD FLYNN ("FLYNN"), at all times relevant hereto, is the City of Milwaukee Chief of Police, and said Chief of Police is responsible for the management and carrying out of the activities of Milwaukee Police Officers, all acting under color of State law, as herein set forth, and participated and agreed in the policies, practices and procedures leading to excessive force and violation of the 4th and 14th Amendments to the United States Constitution, and the due process clause of the 14th Amendment to the United States Constitution, in that he agreed, approved, and promoted policies which led to

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 3 of 30   Document 1

excessive force, contrary to the 4th and 14th Amendments to the United States Constitution, as alleged below in Paragraph "14" through "21" herein.

9.  That Defendants, Police Officer JOHN SCHOTT, Police Officer MARTEZ BALL, and Police Officer JOHN IVY, at all times material hereto, were adult residents of the City of Milwaukee, State of Wisconsin, and were employed and members of the Milwaukee Police Department ("MPD") at all times pertinent hereto and, at all times pertinent, were acting under color of State law in carrying out the duties of Milwaukee Police Officers, and acting in the scope of their employments with said City of Milwaukee.

10. That Defendant Police Officer TODD KURTZ and Police Officer DANIEL DITTORRICE, were adult residents of the City of West Allis, State of Wisconsin, and were employed and members of the West Allis Police Department ("WAPD") at all times pertinent hereto and, at all times pertinent, were acting under color of State law in carrying out the duties of West Allis Police Officers, and acting in the scope of their employments with said City of West Allis.

11. Defendant Special Agent JAMES KRUEGER worked for the United States Government, Drug Enforcement Administration, and was acting under color of law and carrying out his employment under Federal, and carrying out the duties of law enforcement officer, within the scope of his employment.

12. That each and all of the Defendant specified above were operating under color of State law in carrying out their duties in the scope of their employment as members of the High Intensity Drug Trafficking Area Task Force, (HIDTA), which was formed under the policies and authorization of the City of Milwaukee Police Department.

13. Each Defendant acted jointly and severally to cause the death of JERMAINE CLAYBROOKS on or about March 16th, 2017, who died at the scene of the incident, and all were acting under color of law as the HIDTA unit.

## FACTS

14. Since 2008, Defendant City of Milwaukee ("CITY" or "MILWAUKEE"), through the MPD, has engaged in an unlawful policy, practice, and custom of conducting a high-volume, suspicion-less stop and frisk program. This program authorizes MPD officers to stop people without objective and articulable reasonable suspicion of criminal conduct, and to frisk people without reasonable suspicion that the person is armed and dangerous, as required under the Fourth Amendment. Under this program, the MPD also conducts pervasive stops and frisks that are motivated by race and ethnicity in violation of the Fourteenth Amendment and Title VI.

15. The MPD's unconstitutional, suspicion-less stop and frisk program was adopted as part of a so-called "broken windows" policing strategy purportedly devised to deter crime. The strategy includes blanketing certain geographic areas in which residents are predominantly people of color with "saturation patrols" by MPD officers, who conduct high-volume, suspicion-less stops and frisks throughout the area. Over time, the MPD's program has developed into a formal and informal quota system that requires patrol officers to meet numerical targets for stops on a regular basis.

16. As a result, the combined number of MPD traffic and pedestrian stops skyrocketed from just 66,657 in 2007 to 196,434 in 2015 - a staggering, nearly threefold increase.

17. Overwhelmingly, the victims of the MPD's suspicion-less stop and frisk program are Black and Latino people. Though implemented citywide, the MPD's program has been largely

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 5 of 30   Document 1

concentrated in neighborhoods of color, including Milwaukee Police Districts Three, Five, and Seven, all of which are located in predominantly Black neighborhoods in the northern half of the City.

18. In addition, data reflect that Black and Latino people are more likely than Caucasians to be stopped and frisked throughout Milwaukee, including in mixed-race and predominantly white neighborhoods. A 2011 Milwaukee Journal Sentinel analysis of MPD traffic stop data found that Black drivers citywide were seven times more likely – and Hispanic drivers were five times more likely – to be targeted for a traffic stop than Caucasian drivers. Moreover, non-Hispanic Black people made up 72% of the targets of MPD stops conducted between 2010 and 2012 that were documented in an MPD database, even though they only made up an estimated 34% of the City's total population at the time, according to U.S. Census figures.

19. The MPD's high-volume, suspicion-less stop and frisk program has created and deepened public fear of and alienation from the MPD, particularly among Black and Latino residents. Black and Latino people throughout Milwaukee – including children – fear that they may be stopped, frisked, or otherwise treated like criminal suspects when doing nothing more than walking to a friend's house or home from school, driving to and from the homes of loved ones, running errands, or simply taking a leisurely walk or drive through the City. No matter where they are in the City, Black and Latino people face the constant fear that they and their children may be subjected to police harassment even if they are doing nothing wrong. There is a long, tragic history of a widespread pattern of constitutional violations committed by MPD officers.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 6 of 30   Document 1

20. That the policies alleged in Paragraphs "14" through "19" indicate a widespread practice of using excessive force, contrary to the 4th and 14th Amendments to the United States Constitution, and the due process of the 14th Amendment to the United States Constitution.

21. There has been a habit and routine practice by MPD officers, as evidenced by victims of said policies, including, but not limited to, Daniel Bell, Ernest Lacy, Tandy O'Neal, Justin Fields, Curtis Harris, Frank L. Jude, Jr., Wilber Prado and Derek Williams, all victims of a violation of excessive force under the 4th and 14th Amendments to the United States Constitution and the due process clause of the 14th Amendment to the United States Constitution, and were evidence of said policy and procedure of the City of Milwaukee, by and through its police officers and imputed to the City of Milwaukee.

22. That one of the latest victims of the widespread pattern of constitutional rights violations committed by MPD officers is JERMAINE CLAYBROOKS, who suffered an unlawful stop and attempted arrest which resulted in the fatal use excessive force.

23. That the moving force behind the widespread pattern of constitutional violations committed by MPD officers, including the violations suffered by JERMAINE CLAYBROOKS, are the unconstitutional policies of MILWAUKEE including: (a) the deficient hiring and retention policy; (b) the failure to train policy; (c) the failure to discipline policy; and (d) the custom of condoning constitutional rights violations.

24. That the Fire and Police Commission (FPC) and MPD Chief of Police are the policy-makers for MILWAUKEE with respect to the discipline of MPD officers.

25. That MILWAUKEE has a long history of failing to discipline its police officers for misconduct, including, but not limited to, the commission of constitutional rights violations

under the 4th and 14th Amendments to the United States Constitution, and the Due Process Clause of the 14th Amendment to the United States Constitution.

26. That the policies of MILWAUKEE with respect to its failures to discipline MPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by JERMAINE CLAYBROOKS under the 4th and 14th Amendments to the United States Constitution, and the Due Process Clause of the 14th Amendment to the United States Constitution.

27. That MILWAUKEE had actual and/or constructive notice that MPD officers were unlawfully detaining individuals prior to March 16, 2017.

28. That, despite having actual and/or constructive notice that MPD officers were unlawfully detaining individuals, MILWAUKEE took no action to cease such unlawful conduct of discipline the MPD officers involved.

29. That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unlawfully detaining individuals, MILWAUKEE allowed the unlawful detentions to continue, including the unlawful arrest suffered by JERMAINE CLAYBROOKS.

30. That MILWAUKEE had actual and/or constructive notice that MPD officers were unreasonably arresting and searching individuals prior to March 16, 2017.

31. That, despite having actual and/or constructive notice that MPD officers were unreasonably searching individuals, MILWAUKEE took no action to discipline the MPD officers involved.

32. That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unreasonably arresting searching individuals, MILWAUKEE allowed the unreasonable

arrests and searches to continue, including the unreasonable arrest suffered by JERMAINE
CLAYBROOKS.

33. That MILWAUKEE had actual and/or constructive notice that MPD officers were using
excessive force against individuals prior to March 16, 2017.

34. That, despite having actual and/or constructive notice that MPD officers were using
excessive force against individuals, MILWAUKEE took no action to discipline the MPD
officers involved.

35. That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in
using excessive force against individuals, MILWAUKEE allowed the use of excessive
force to continue, including the use of excessive force suffered by JERMAINE
CLAYBROOKS.

36. That DEFENDANTS unlawfully detained, unreasonably searched, and used excessive
force against JERMAINE CLAYBROOKS, because, prior to April 30, 2014, other MPD
officers had not been disciplined for similar misconduct.

37. That MILWAUKEE presently maintains a policy of failing to discipline MPD officers for
engaging in misconduct, including, but not limited to, unlawful detentions, unreasonable
searches and uses of excessive force.

38. That, if MILWAUKEE had not failed to discipline MPD officers for unlawful detentions,
unreasonable searches and uses of excessive force, the unlawful detention unreasonable
search and the use of excessive force suffered by JERMAINE CLAYBROOKS would not
have happened.

39. That MILWAUKEE presently maintains a policy of failing to discipline MPD officers for engaging in misconduct, including, but not limited to, unlawful detentions, unreasonable searches and uses of excessive force.

40. That, prior to March 16, 2017 and continuing to the present, MILWAUKEE maintained/maintains a custom of condoning constitutional rights violations by MPD officers, particularly violations of the 4th and 14th Amendments to the United States Constitution, and the Due Process Clause of the 14th Amendment.

41. That this custom of condoning constitutional rights violations by MPD officers was/is so persistent and widespread that it was/is the official policy of MILWAUKEE.

42. That, prior to April 30, 2014, MILWAUKEE had actual and/or constructive notice of the custom of condoning constitutional rights violations by MPD officers.

43. That the American Civil Liberties Union, (ACLU) has filed a federal civil rights action against the City of Milwaukee and Milwaukee Police Department, alleging constitutional violations and deprivations, now pending in the Eastern District of Wisconsin.

44. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was/is the failure to discipline MPD officers for misconduct, as set forth in the preceding paragraphs.

45. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was/is the "code of silence" that exists within the MPD, even though this code may be contrary to the express policies of MILWAUKEE.

46. That the MPD's "code of silence" is where MPD officers do not report the misconduct of their fellow officers due to the fear of retaliation.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 10 of 30   Document 1

47. That MILWAUKEE has taken no action with respect to any MPD officer following the "code of silence" by refusing to testify in civil or criminal proceedings.

48. That, in 2009, Defendant EDWARD A. FLYNN, Chief of Police for Milwaukee County, admitted that a "code of silence" existed in the Milwaukee Police Department, and also indicating that he approved of the unconstitutional procedures outlined in Paragraphs "14" through "19", making him a proper Defendant herein.

49. That the "code of silence" continues to exist within the MPD and is currently the custom and policy of MILWAUKEE.

50. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers is the concept of *"noble cause corruption"* that exists within the MPD, even though this concept may be contrary to the express policies of MILWAUKEE.

51. That the concept of "noble cause corruption" is where MPD officers engage in misconduct because they believe they are accomplishing a greater good.

52. That in 2012, FLYNN admitted that the concept of "noble cause corruption" exists within the MPD.

53. That MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was the moving force behind the constitutional violations suffered by JERMAINE CLAYBROOKS, specifically the 4th and 14th Amendments to the United States Constitution and the Due Process Clause of the 14th Amendment.

54. That the constitutional violations suffered by JERMAINE CLAYBROOKS happened because these Defendants were following the concept of "noble cause corruption," engaging in unlawful detentions, unreasonable searches and uses of excessive force, because he believed that such actions would serve the greater good of the community.

55. That had MILWAUKEE not maintained a custom of condoning constitutional violations, the constitutional violations suffered by JERMAINE CLAYBROOKS under the 4th and 14th Amendments to the United States Constitution and the Due Process Clause of the 14th Amendment would not have occurred.

56. That there is a long history of constitutional violations committed by MPD officers that were caused by the policies and customs of MILWAUKEE. That the constitutional violations, specifically under the 4th and 14th Amendments to the United States Constitution and the Due Process Clause of the 14th Amendment include, but are not limited to, the events listed below.

57. That in 1958, MPD Officer Thomas Grady planted a knife on Daniel Bell to support his false claim that Mr. Bell was armed and attacked him.

58. That MPD Officer Louis Krause followed the MPD's "code of silence" by conspiring with MPD Officer Thomas Grady to lie about the incident which led to the fatal shooting of Daniel Bell.

59. That between 1979 and 1980, the United States Department of Justice ("DOJ") conducted an investigation into a possible pattern of misconduct within the MPD.

60. That former MPD Chief of Police Harold Brier refused to cooperate with the DOJ investigation.

61. That the DOJ investigation found that 22 people died in MPD custody between 1975 and 1979.

62. That the DOJ investigation ultimately determined that former MPD Chief of Police Harold Brier had no accountability for the deaths.

63. That in 1981, Ernest Lacy died in MPD custody after MPD officers used excessive force against him and then failed to provide him with medical assistance.

64. That, despite a medical examiner documenting over 30 cuts and bruises on Ernest Lacy's body, and witness accounts describing MPD officer use of excessive force against Mr. Lacy, former MPD Chief of Police Harold Brier claimed that MPD officers did nothing wrong during the incident that resulted in the death of Mr. Lacy.

65. That former MPD Chief of Police Harold Brier refused to cooperate with any federal investigation into the death of Ernest Lacy.

66. That, in 1988, MPD officers shot Tandy O'Neal in the back, rendering Mr. O'Neal a quadriplegic.

67. That a MPD detective, following the MPD's "code of silence," initially stated that Tandy O'Neal struggled with MPD officers prior to being shot.

68. That the MPD Detective eventually admitted that his statement regarding Tandy O'Neal struggling with MPD officers was not true.

69. That, in 2003, MPD Officer Craig Nawotka shot and killed Justin Fields.

70. That MPD Officer Craig Nawotka shot Justin Fields in the back as Mr. Fields was slowly driving away from MPD officers.

71. That MPD Sergeant Harold Hampton, who conducted the MPD internal investigation into MPD Officer Craig Nawotka's shooting of Justin Fields, testified under oath that the head of the MPD internal affairs division ignored Sergeant Hampton's findings that Officer Nawotka violated several MPD rules during the incident that resulted in the shooting of Mr. Fields.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 13 of 30   Document 1

72. That MILWAUKEE settled a civil rights action filed by the family of Justin Fields for $1.6 million.

73. That in 2003, MPD Officer Kevin Clark slammed Curtis Harris' head into the wall and floor of the MPD District 3 Police Station booking room.

74. That as a result of MPD Officer Kevin Clark's actions, Curtis Harris was rendered a quadriplegic.

75. That MPD Officer Kevin Clark claimed that Curtis Harris was trying to hit him, but video from the incident refuted Officer Clark's claim.

76. That MILWAUKEE settled a federal civil rights action filed by Curtis Harris for $3 million.

77. That MILWAUKEE took no action against MPD Officer Kevin Clark for his actions during the incident with Curtis Harris.

78. That MPD Officer Kevin Clark was later fired from the MPD after he pled guilty to insurance fraud after collecting worker's compensation benefits for injuries he sustained while sledding on duty.

79. That MPD Officer Kevin Clark and other MPD officers followed the MPD's "code of silence" by covering up the sledding while on duty incident.

80. That although they initially denied any involvement in the Frank L. Jude, Jr. incident, several MPD officers ultimately pled guilty in federal court to violating Mr. Jude's constitutional rights.

81. That following a federal criminal trial, a jury determined that several other MPD officers violated Frank L. Jude, Jr. 's constitutional rights.

82. That MILWAUKEE settled Frank L. Jude, Jr. 's federal civil rights action for $2.1 million.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 14 of 30   Document 1

83. In March 2005, MPD Officer Alfonzo Glover shot and killed Wilbert Prado. Following the trial on the Prado family's federal civil rights action, a jury determined that MPD Officer Alfonzo Glover violated Wilbert Prado's constitutional rights.

84. That MIILW AUKEE ultimately settled the Prado family's federal civil rights action.

85. That, in 2012, MPD Sergeant Jason Mucha was reassigned after multiple complaints of invasive body cavity searches.

86. That, within a three-year time period, Sergeant Mucha was accused on at least ten (10) occasions of using excessive force and/or planting drugs on citizens.

87. That in August 2005, the Milwaukee County Circuit Court, the Honorable Charles F. Kahn, Jr. presiding, ruled that several persons who had accused Sergeant Mucha of using excessive force could testify in a criminal case wherein the defendant accused Sergeant Mucha of using excessive force. (*State of Wisconsin v. Lemar Barnes*, Milwaukee County Case Number 04-CF-1001, Amended Decision of Admissibility of Evidence, dated August 10, 2005.)

88. That, on March 14, 2006, the Court of Appeals of Wisconsin issued an opinion reversing a trial court decision that denied a criminal defendant's request to introduce evidence that Sergeant Mucha had used excessive force and/or planted drugs on other persons. (*State of Wisconsin v. Walter T. Missouri*, 2006 WI App 74.)

89. That, between 2000 and 2007, the MPD investigated Sergeant Mucha for seven (7) battery complaints, four (4) unreasonable search complaints, two (2) theft complaints and one (1) false arrest complaint.

90. That the MPD claimed that all the complaints against Sergeant Mucha set forth in the preceding paragraph were either unfounded or unsubstantiated.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 15 of 30   Document 1

91. That the MPD either failed to notice or intentionally disregarded a pattern and/or trend with respect to Sergeant Mucha's misconduct.

92. That, on July 6, 2011, Derek Williams died in MPD custody after MPD officers may have used excessive force against Mr. Williams and then failed to provide Mr. Williams with medical assistance, despite the fact that Mr. Williams was in the back seat of an MPD squad car struggling to breathe and begging MPD officers for help.

93. That an Inquest was held to determine whether any of the MPD officers involved should face criminal charges as a result of the death of Derek Williams.

94. That, following the conclusion of testimony, the Derek Williams Inquest jury issued an advisory verdict that MPD Officers Richard Ticcioni, Jason Bleichwehl, and Jeffrey Cline should be criminally charged pursuant to Wisconsin Statute Section 940.291, Law Enforcement Officer; Failure to Render Aid.

95. That despite the Derek Williams Inquest jury's advisory verdict, the special prosecutor who conducted the Inquest refused to bring criminal charges against Officers Ticcioni, Bleichwehl and Cline.

96. That MILWAUKEE took no action against Officers Ticcioni, Bleichwehl, Cline, or any other MPD officers involved in the death of Derek Williams.

97. That on September 22, 2011, MPD Officer Richard Schoen used excessive force against a woman in his custody by punching her in the face multiple times, grabbing her by the hair as he removed her from an MPD squad car, and kneeing her in the stomach.

98. That the MPD fired Officer Schoen as a result of his actions on September 22, 2011.

99. That the FPC then reversed the MPD's decision to fire Officer Schoen and instead gave him his job back, suspending him for 60 days.

100. That, following a public outcry, the FPC reinstated the MPD's decision to fire Officer Schoen.

101. That, in 2013, a jury determined that MPD Detective Rodolfo Gomez either intentionally, or with reckless disregard for the truth, made false or misleading statements in an affidavit accompanying a search warrant application, awarding the victim of Detective Gomez's misconduct $1,000,000. (*Richard Betker v. Rodolfo Gomez*, United States District Court for the Eastern District of the United States Case Number 08-CV-760, Verdict Form dated November 20, 2013.)

102. That, from approximately 2008 to 2012, several MPD officers conducted illegal pat-down searches, illegal strip searches and illegal body cavity searches of numerous individuals.

103. That over 70 individuals alleged federal civil rights claims against the MPD officers for the illegal pat-down searches, illegal strip searches and illegal body cavity searches.

104. That MILWAUKEE settled the individuals' federal civil rights claims involving the illegal pat-down searches, illegal strip searches and illegal body cavity searches for $5 million.

105. That on March 16, 2017, the Defendants, as part of teams formed to execute search warrants in narcotics cases involving Anthony Q. Vivians, executed those search warrants and arrested individuals, including Anthony Q. Vivians.

106. That subsequent to the execution of the search warrants, Anthony Q. Vivians requested to meet with these Defendants and become a confidential informant.

107. That Anthony Q. Vivians ("Vivians") then met with the Defendants and advised them that in exchange for charge or sentence leniency, he would lure his "source" for narcotics, whom he referred to as "Big Bro" and "Plug," so the Defendants could affect an arrest.

108. That Vivians then provided a California phone number to the Defendants, which he advised was the contact number for "Big Bro" or "Plug," and that he would lure said person to the neighborhood of 19th and Stark in Milwaukee, Wisconsin.

109. That Vivians had no actual name of his "source" for narcotics.

110. That Vivians had no physical address for his "source" for narcotics.

111. That Vivians had no license number for the vehicle driven by his "source" for narcotics.

112. That Vivians described the vehicle which his "source" for narcotics customarily drove, as a dark gray, with tinted windows.

113. That Vivians omitted that his family members resided on or close to 19th and Stark, in Milwaukee, Wisconsin.

114. That Vivians is a career criminal, with convictions for narcotics trafficking and faced a "life" sentence in State or Federal courts, as a result of his arrest on March 16, 2017.

115. That the Defendants had no prior experience with Vivians upon which to formulate a proper determination of his credibility as an informant.

116. That subsequent to Vivians requesting to become an informant, a plan was devised by the Defendants whereby Vivians would accompany the Defendants and "point out" the vehicle in which his source of narcotics was driving, in or about 19th and Stark, Milwaukee, Wisconsin.

117. That on March 16, 2017, Vivians, while riding in the black SUV operated by KRUEGER, pointed out the vehicle operated by JERMAINE CLAYBROOKS.

118. That upon Vivians' pointing to a vehicle, the plan called for a forced interception of the vehicle operated by JERMAINE CLAYBROOKS, by means of wedging the vehicle between numerous undercover vehicles and arrest the occupant.

119. That prior to the pointing out by Vivians, these Defendants had no prior knowledge or investigation involving JERMAINE CLAYBROOKS by the Drug Enforcement Agency, HIDTA or MPD.

120. That prior to the pointing out by Vivians, these Defendants had never affected a controlled buy of any narcotics from JERMAINE CLAYBROOKS.

121. That prior to the pointing out by Vivians, these Defendants had never applied for or obtained a valid Search or Arrest warrant for the vehicle operated by JERMAINE CLAYBROOKS or for JERMAINE CLAYBROOKS, his vehicle or residence.

122. That prior to unlawfully stopping of JERMAINE CLAYBROOKS, the Defendants lacked any probable cause or articulable suspicion, pursuant to the 4th and 14th Amendments to the United States Constitution.

123. That on March 16, 2017, these Defendants knew or should have known, that they had no probable cause upon which to stop, detain or otherwise interfere with the life of JERMAINE CLAYBROOKS.

124. That on March 16, 2017, subsequent to Vivians pointing out a gray Toyota Avalon, which was operated by JERMAINE CLAYBROOKS, these Defendants, none of whom wore any uniform whatsoever and were dressed in "street clothes," then executed their plan by having undercover vehicles approach JERMAINE CLAYBROOKS at a high rate of speed and box him in on 19th and Stark, Milwaukee, Wisconsin.

125. That the vehicular maneuver executed by these Defendants caused JERMAINE CLAYBROOKS to strike a tree on the West side of 19th, whereby the front tires began to spin wildly while being prevented from forward movement by the tree.

126. That the Defendants then surrounded the vehicle, dressed in "street clothes," with weapons drawn.

127. That the spinning tires on the vehicle operated by JERMAINE CLAYBROOKS caused dense, acrid smoke to form inside the vehicle of JERMAINE CLAYBROOKS, whereby some of that smoke billowed from the windows, engine compartment and from underneath the vehicle, obstructing any clear vision into the vehicle operated by JERMAINE CLAYBROOKS.

128. That while the Defendants' vision was obscured by the tire smoke, the front tire, having been spinning about twenty minutes and smoking, deflated with an audible pop and one of the Defendants then shouted "gun."

129. That at this point, all of the Defendants began blindly firing rounds into the vehicle of JERMAINE CLAYBROOKS, striking him approximately twenty times and killing him.

130. That at no time, did JERMAINE CLAYBROOKS point or discharge any firearm at any of the Defendants.

131. That the Defendants lacked any justification for shooting and killing JERMAINE CLAYBROOKS.

132. That subsequent to killing JERMAINE CLAYBROOKS, these Defendants then conspired, confederated and agreed to obfuscate the facts surrounding the confidential informant, the lack of probable cause or reasonable suspicion to arrest JERMAINE CLAYBROOKS, the "plan" devised by the Defendants and the killing of JERMAINE CLAYBROOKS by these Defendants.

133. That in furtherance of the scheme or artifice devised by these Defendants, jointly and severally, the MPD Defendants invoked their right to remain silent for fear of self-

incrimination and refused to cooperate with Wauwatosa PD investigators that were designated by Wisconsin Statute [1] to investigate the shooting.

## CAUSES OF ACTION

### First Cause of Action

Title 42, United States Code, Section 1983 Unlawful Arrest & Detention against Defendants

134. Plaintiffs reallege, and incorporate by reference, the allegations of the preceding paragraphs.

135. That JERMAINE CLAYBROOKS had a constitutionally protected right not to be unlawfully stopped, detained, and killed, pursuant to the 4th and 14th Amendments of the United States Constitution.

136. That, as set forth in the preceding paragraphs, the Defendants unlawfully stopped, detained, and ultimately killed JERMAINE CLAYBROOKS.

137. That the Defendants acted under color of State law, custom, practice and/or procedures, as required by Title 42 U.S.C. Section 1983.

138. That the Defendants' unlawful stop and detention resulted in the death of JERMAINE CLAYBROOKS.

### Second Cause of Action

Title 42, United States Code, Section 1983 Excessive Force against the Defendants

139. Plaintiffs reallege, and incorporate by reference, the allegations of the preceding paragraphs.

140. That JERMAINE CLAYBROOKS had a constitutionally protected right not to have excessive force used against him, pursuant to the 4th and 14th Amendments to the United States Constitution.

---

[1] 175.47    Review of deaths involving officers.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 21 of 30   Document 1

141. That, as set forth in the preceding paragraphs, the Defendants used excessive force against JERMAINE CLAYBROOKS.

142. That the Defendants intentionally used excessive force against JERMAINE CLAYBROOKS.

143. That the Defendants acted under color of State law, practices, procedures and policies.

144. That the Defendants, by jointly and severally shooting at JERMAINE CLAYBROOKS' automobile, resulting in death, was a use of excessive force contrary to the 4th and 14th Amendments to the United States Constitution, and the Due Process Clause of the 14th Amendment to the United States Constitution.

145. That the Defendants' use of excessive force resulted in the death of JERMAINE CLAYBROOKS.

## Third Cause of Action

Title 42, United States Code, Section 1983
Loss of Society and Companionship against the Defendants

146. Plaintiffs reallege, and incorporate by reference, the allegations of the preceding paragraphs.

147. That the conduct of the Defendants, as set forth in the preceding paragraphs, which resulted in the death of JERMAINE CLAYBROOKS, deprived JERMAINE CLAYBROOKS biological children, J.C.C. and J.M.C., of the society and companionship of their father.

## Fourth Cause of Action

Wisconsin Statute Section 895.46 Indemnification against MILWAUKEE

148. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

149. That at all times material hereto, the Defendants were carrying out their duties as officers or agents of the MPD and HIDTA, and were acting within the scope of their employment with MILWAUKEE.

150. That the conduct of the Defendants, as set forth in the preceding paragraphs, resulted in the death of JERMAINE CLAYBROOKS.

151. That MILWAUKEE is liable, pursuant to Wisconsin Statute Section 895.46, for any judgment entered against the Defendants in this action because, at all times material hereto, the Defendants were carrying out their duties as an MPD officers or agents, and were acting within the scope of their employment with MILWAUKEE.

**Fifth Cause of Action**

Title 42, United States Code, Section 1983
Deficient Hiring and Continued Employment Policy against MILWAUKEE

152. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

153. That at all times material hereto, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

154. That prior to 2005, MILWAUKEE had an official policy with respect to the hiring and continued employment of MPD officers.

155. That prior to 2005, the policymakers of MILWAUKEE made a conscious choice from various alternatives to follow its official policy with respect to the hiring and continued employment of MPD officers.

156. That prior to 2005, MILWAUKEE's official policy with respect to the hiring and continued employment of MPD officers was deficient in that it did not include administration of complete psychological testing of police officer candidates.

157. That prior to 2005, the policymakers of MILWAUKEE permitted the hiring of certain MPD officers, even though complete psychological testing would lead an objectively reasonable policymaker to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

158. That prior to 2005 and continuing to the present, the policymakers of MILWAUKEE permitted/permit the continued employment of certain MPD officers, even though complete psychological testing would lead an objectively reasonable policymaker to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

159. That the policymakers of MILWAUKEE knew or should have known that, as set forth in the preceding paragraphs, complete psychological testing of police officer candidates was needed to avoid highly likely deprivations of constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

160. That MILWAUKEE's deficient policy with respect to the hiring and continued employment of MPD officers caused the violation of JERMAINE CLAYBROOK's constitutional rights

under the 4th and 14th Amendments to the United States Constitution, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

161. That MILWAUKEE's official policy with respect to the hiring of MPD officers may be currently deficient in that it does not include administration of complete psychological testing of police officer candidates.

**Sixth Cause of Action**

Title 42, United States Code, Section 1983 Failure to Train Policy against MILWAUKEE

162. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

163. That at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

164. That prior to March 16, 2017, and continuing to the present, the policymakers of MILWAUKEE made/make a conscious choice from various alternatives to follow its official policies with respect to the training of MPD officers.

165. That, as set forth in the preceding paragraphs, prior to March 16, 2017, and continuing to the present, MILWAUKEE's official policies with respect to the training of MPD officers were/are inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.

166. That prior to March 16, 2017, and continuing to the present, the policymakers of MILWAUKEE knew or should have known that more and/or different training of MPD officers with respect to: (a) encountering individuals who are suffering from mental illness and/or experiencing a crisis situation; (b) dealing with intense situations involving individuals who are suffering from mental illness and/or experiencing a crisis situation; and (c) using force against individuals was/is needed to avoid likely unlawful detentions,

unreasonable searches, and uses of excessive force; and/or that this was/is plainly obvious to the policymakers of MILWAUKEE.

167. That MILWAUKEE's failure to provide adequate training to MPD officers caused the violation of JERMAINE CLAYBROOKS' constitutional rights under the 4th and 14th Amendments to the United States Constitution, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

168. That MILWAUKEE's official policies with respect to the training of MPD officers are currently inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.

**Seventh Cause of Action**

Title 42, United States Code, Section 1983 Failure to Discipline Policy against MILWAUKEE

169. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

170. That at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

171. That prior to March 16, 2017, and continuing to the present, the policymakers of MILWAUKEE made/make a conscious choice from various alternatives to follow its official policies with respect to the discipline of MPD officers.

172. That, as set forth in the preceding paragraphs, prior to March 16, 2017 and continuing to the present, MILWAUKEE's official policies with respect to the discipline of MPD officers were/are inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.

173. That prior to March 16, 2017 and continuing to the present, the policymakers of MILWAUKEE knew or should have known that more and/or different policies with respect

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 26 of 30   Document 1

to the discipline of MPD officers was/is needed to avoid likely unlawful detentions, unreasonable searches, and uses of excessive force; and/or that this was/is plainly obvious to the policymakers of MILWAUKEE.

174. That MILWAUKEE's failure to discipline MPD officers caused the violations of JERMAINE CLAYBROOKS' constitutional rights under the 4th and 14th Amendments to the United States Constitution, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

175. That MILWAUKEE's official policies with respect to the discipline of MPD officers are currently inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.

**Eighth Cause of Action**
Title 42, United States Code, Section 1983
Custom of Condoning Constitutional Rights Violations against MILWAUKEE

176. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

177. That at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983, because their practices, habits and routines approved, promoted, and condoned the excessive use of force to stop, detain and arrest individuals in the fashion that occurred in the death of JERMAINE CLAYBROOKS.

178. That the actions and/or inactions of the Defendants in unlawfully detaining, unreasonably searching, and using excessive force against JERMAINE CLAYBROOKS were done in accordance with MILWAUKEE's custom of condoning constitutional rights violations.

Case 2:19-cv-00160-WED   Filed 01/31/19   Page 27 of 30   Document 1

179. That MILWAUKEE's custom of condoning constitutional rights violations was/is so persistent and widespread, as set forth in the preceding paragraphs, that it was/is MILWAUKEE's official policy.

180. That MILWAUKEE's custom of condoning constitutional rights violations permitted, encouraged, tolerated or ratified the actions and/or inactions of the Defendants, all in malicious or reckless disregard or with deliberate indifference regarding the constitutional rights of JERMAINE CLAYBROOKS.

181. That the policymakers of MILWAUKEE made/make a conscious choice from various alternatives to follow its custom of condoning constitutional rights violations.

182. That the policy-makers of MILWAUKEE acted with deliberate indifference to the consequences of its custom of condoning constitutional rights violations.

183. That MILWAUKEE's custom of condoning constitutional rights violations caused the violations of JERMAINE CLAYBROOKS' constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

**Ninth Cause of Action**

Title 42, United States Code, Section 1983

Custom of Condoning Constitutional Rights Violations against KRUEGER

184. That, as a member of the HIDTA unit, Agent KRUEGER, as an employee of the United States Government Drug Enforcement Administration, was acting as a member of the HIDTA team and was acting under cover of State law, and, jointly and severally, violated the 4th and 14th Amendments to the United States Constitution, and the Due Process Clause of the 14th Amendment to the United States Constitution, by shooting JERMAINE CLAYBROOKS on March 16, 2017.

185. That the conduct of said Defendant Agent of the United States Government Drug Enforcement Administration was carried out pursuant to State law and the HIDTA unit, and his conduct was a substantial factor in causing the death of JERMAINE CLAYBROOKS on March 16, 2017.

186. That the conduct of the Defendants, jointly and severally, were reckless, intentional, and unjustifiable actions leading to the death of JERMAINE CLAYBROOKS, justifying an award of compensatory damages, funeral and burial expenses, pecuniary loss of his estate, pain and suffering, loss of companionship for the minor children, as alleged above, in an amount to be determined by the jury.

187. That each and every Defendant, including the corporate Defendants, and Defendant FLYNN's, actions and conduct that culminated in the death of JERMAINE CLAYBROOKS on March 16th, 2017, were done intentionally and maliciously, and justify an award of punitive damages.

188. That because the use of excessive force, contrary to the 4th and 14th Amendments of the United States Constitution and the Due Process Clause of the 14th Amendment, has been a custom and practice, which led to the death of JERMAINE CLAYBROOKS on March 16, 2017, the entry of a Consent Decree against the CITY OF MILWAUKEE, EDWARD P. FLYNN, and others, wherein the Court maintains jurisdiction to prevent and protect other citizens from policies, practices, and procedures leading to the unconstitutional stops, detentions and arrests of Milwaukee citizens.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants, as follows:

     A.     A judgment in an amount to be determined by the jury for compensatory and punitive damages as above alleged;

B.    A judgment in favor of the Plaintiffs against the City of Milwaukee for its liability pursuant to Wisconsin Statutes 895.46;

C.    For the entrance in conjunction for equitable relief, by way of Consent Decree, against the City of Milwaukee and Edward Flynn to prevent actions such as this that will harm citizens in the future;

D.    For costs, disbursements, pre-judgment interest, and reasonable attorney's fees pursuant to Title 42 United States Code Section 1988; and

E.    For any other further relief the Court deems just and equitable.

PLAINTIFFS HEREBY DEMAND A JURY TRIAL OF THIS ACTION
ON ALL ISSUES SO TRIABLE.

Dated this 31st day of January, 2019

By:    *Electronically signed by Walter W. Stern III*
       WALTER W. STERN III
       Counsel for Joan McCants, Co-Special
       Administrator of the Estate of Jermaine
       Claybrooks, and Markia Love obo JDC
       Law Office of Walter W. Stern III
       920 85th Street, Unit 123
       Kenosha, WI 53143
       Phone: (262) 880-0192/Fax:  (262) 977-1101
       wstern1@wi.rr.com

By:    *Electronically signed by Verona Swanigan*
       VERONA SWANIGAN, Esq.
       Counsel for Keyanna Allen, Co-Special
       Administrator of the Estate of Jermaine
       Claybrooks and Keyanna Allen obo JJC
       The Swanigan Firm
       300 S. Spring St Ste 400
       Little Rock, AR 72201
       WI SBN#  1086459